787 A.2d 928 (2002)
346 N.J. Super. 285
In the Matter of the COMMITMENT OF B.L.
In the Matter of the Commitment of M.W.
Superior Court of New Jersey, Appellate Division.
Argued December 3, 2001.
Decided January 3, 2002.
*931 Lorraine Hunter Hoilien, Assistant Deputy Public Defender, argued the cause for appellant B.L. in A-0132-00T5 (Peter A. Garcia, Acting Public Defender, attorney; Ms. Hoilien and Theodore S. Novak, Deputy Public Defender, on the brief).
Theodore S. Novak, Deputy Public Defender, argued the cause for appellant M.W. in A-1298-00T1 (Peter A. Garcia, Acting Public Defender, attorney; Mr. Novak and Lorraine Hunter Hoilien, Assistant Deputy Public Defender, on the brief).
Carolyn B. Uliase, Woodbury, argued the cause for respondent Atlantic County in A-0132-00T5 (Hasbrouck & Uliase, attorneys).
Office of Cape May County Counsel, attorney for respondent Cape May County in A-1298-00T1, did not file a brief.
Before Judges HAVEY, BRAITHWAITE and WEISSBARD. *929
*930 The opinion of the court was delivered by BRAITHWAITE, J.A.D.
Appellants B.L. and M.W.[1], former patients at Ancora Psychiatric Hospital ("Ancora"), appeal from orders revoking their conditional release from Ancora and recommitting them to that facility. They both contend that their involuntary rehospitalization violated New Jersey's civil commitment statute and their due process rights under the United States and New Jersey Constitutions.
Because we agree with B.L. and M.W. that the procedures used here violated the New Jersey civil commitment statute and their due process rights, we reverse the orders involuntarily recommitting them to Ancora. Furthermore, we set forth the procedures to be followed for future cases by mental health service providers and the trial court when a patient, who has been conditionally released, violates his or her conditions.
Although both B.L. and M.W. are no longer involuntarily committed, their appeals are not moot because they both remain liable for the cost of their confinement. It is well settled in New Jersey that an appeal in these types of cases is not moot, even if the patient is no longer confined, when the patient remains liable for his or her hospital bill, and a finding in the patient's favor will entitle the patient to a credit for any period of illegal commitment. In re R.B., 158 *932 N.J.Super. 542, 545, 386 A.2d 893 (App. Div.1978); accord In re W.H., 324 N.J.Super. 519, 521, 736 A.2d 529 (App.Div.1999); In re J.B., 295 N.J.Super. 75, 80, 684 A.2d 925 (App.Div.1996); In re D.M., 285 N.J.Super. 481, 485, n. 1, 667 A.2d 385 (App.Div.1995), certif. denied, 144 N.J. 377, 676 A.2d 1092 (1996); In re Raymond S., 263 N.J.Super. 428, 431, n. 1, 623 A.2d 249 (App.Div.1993); In re A.A., 252 N.J.Super. 170, 172, n. 1, 599 A.2d 573 (App.Div.1991). In addition, even if appellants were not responsible for their hospital costs, "we should nevertheless decide the issue because it implicates a committee's constitutional right to liberty, and by its nature, will continually become moot before judicial review." In re G.G., 272 N.J.Super. 597, 600, n. 1, 640 A.2d 1156 (App.Div.1994).

I
We set forth the undisputed facts relevant to these appeals. B.L. was involuntarily committed to Ancora on May 26, 2000, pursuant to a temporary order. The doctor who examined B.L. determined that he suffered from "schizo affective disorder-bipolar type" and that he was a danger to himself or others. See N.J.S.A. 30:4-27.2b and -27.2m; R. 4:74-7.
On June 30, 2000, Mary Lee, M.D., recommended to the court that B.L. be conditionally released to return to his apartment. Following the hearing, the court released B.L. under instructions that he comply with certain conditions for ninety days. See N.J.S.A. 30:4-27.15c(2). The conditions required B.L. to: (1) take his prescribed medication; (2) attend follow-up medication-monitoring appointments; and (3) cooperate with clinical management services.
On July 11, 2000, B.L. was involuntarily returned to Ancora for a violation of his conditional release because he was not taking his medication and could not maintain himself. The record is devoid of any evidence that the "mental health agency staff person" notified the trial court that B.L. failed to comply with a condition or that he was rehospitalized. N.J.S.A. 30:4-27.15c(3). Further, there is no written explanation for his return to Ancora. On July 28, 2000, the trial court conducted a post-reconfinement hearing to review B.L.'s return from conditional release. See ibid.
At the July 28 hearing, B.L. stated that he was returned to Ancora because he arrived late for an appointment at the Hartford Clinic and was put on the bottom of the list, leading B.L. to "brush" away a piece of paper handed to him. B.L.'s treating psychiatrist, V. Chheda, M.D., stated at the hearing[2] that B.L. was violent and swung at staff on July 11 and also attacked hospital staff on July 14, requiring that he be restrained. Although Dr. Chheda related these "violent" incidents to the court, she acknowledged that B.L. was not committable. Dr. Chheda also said that B.L. had violated his conditional release by not taking his medication.
Dr. Chheda recommended that B.L. be kept on Conditional Extension Pending Placement/Conditional Release ("CEPP/CR" or "CEPP") status until he was stabilized, at which point he could be discharged. B.L.'s counsel argued that it would be inappropriate to continue to confine B.L. on CEPP/CR status because B.L. had an apartment and a "place to go." Counsel further argued that since B.L. was not dangerous and not committable, Ancora could not hold him. There was no evidence presented that B.L. was a danger to himself or others and Dr. Chheda only wanted him to remain for the limited purpose of stabilizing him.
The trial court ordered B.L. to remain at Ancora on CEPP status until he *933 was "stabilized." The reason for that order was B.L.'s violation of the conditions of his release. The court directed Dr. Chheda to "stabilize him as quickly as possible [] and get him out as quickly as [Dr. Chheda could]." The trial court assumed that B.L.'s rehospitalization had been valid, stating that "[h]aving been brought back here, I assume it was appropriate." On August 7, 2000, B.L. was conditionally released to his apartment with the same conditions imposed on June 30, 2000. B.L. filed a timely notice of appeal to the order entered on July 28, 2000. He also appeals his involuntary return to Ancora on July 11, 2000.[3]
With respect to M.W., the following facts are relevant. In October 1999, M.W. was involuntarily committed to Ancora. On August 11, 2000, M.W. was conditionally released from Ancora and placed on CEPP/CR status. The conditions required M.W. to: (1) take her medication; (2) cooperate with case management; and (3) be placed in a group home immediately when a bed became available. The conditions were imposed for a period of ninety days. See N.J.S.A. 30:4-27.15c(2).
On September 1, 2000, M.W. was placed at the Goshen Home ("Goshen") in Cape May County. M.W., however, did not reside at Goshen, but merely went there on several visits. She was involuntarily returned to Ancora on September 16, 2000, for reasons that are not adequately set forth in the record.
On September 22, 2000, M.W. was provided a hearing pursuant to N.J.S.A. 30:4-27.15c(3). At the hearing, Dr. Villanueva, a psychiatrist, told the court that no written documentation of M.W.'s rehospitalization existed, but that her return was based on "verbal" information that she had "decompensated."[4]
Dr. Villanueva added that the factual basis for M.W.'s return was her hallucinations and that she had become suicidal by verbalizing the "voices of Chuck telling her to run in front of a car." This information was included in a report written on September 16, 2000, by M.W.'s admitting physician, Dr. Chang. That report is not part of the record on appeal.
M.W., who was sworn, testified that on September 15, 2000, she had decided not to take her medication because "the voices were telling [her] not to take them," but she "composed" herself and became "ready" to take the medication. She was then given her medication, which she took. She testified that she took all of the medication that she was given.
For the September 22 hearing, Ancora submitted a written report, from Dr. Chheda, M.W.'s treating psychiatrist. The report stated that Dr. Chheda had examined M.W. on September 20, 2000, and that she was not a danger to herself or others. The report included Dr. Chheda's note that M.W. was "awaiting stabilization."
At the September 22 hearing, Dr. Villanueva stated that M.W. was not dangerous, had been taking her medication, and had not been involved in any "incidents of any kind." Dr. Villanueva added that the institution "had to adjust her medication," but that the institution did not want to commit her and wanted "to get her out as soon as possible, as quickly as possible". According to Dr. Villanueva, M.W. would be sent back to the group home that day if the home would stabilize her (meaning, adjust her medication). The doctor noted that "it's [the group home's] responsibility to stabilize her," but added that at the home, "she's, you know, barely being managed." The trial court was ready to conditionally *934 release M.W. back to the group home, but was informed by a hospital social worker, Phyllis Federman, that there may not be a bed available at the group home.
Consequently, the trial court ordered M.W. returned to CEPP status. The conditions were that she: (1) take her medication; (2) cooperate with clinical case management services; and (3) be placed in a group home immediately when a bed became available. By returning M.W. to CEPP/CR status, the court instituted a new ninety-day period of conditional release. M.W. was released from Ancora to Goshen on October 19, 2000. On November 6, 2000, M.W. filed a notice of appeal from the order of September 22, 2000. She also appeals her involuntary return to Ancora on September 16, 2000.[5]

II
B.L. and M.W. argue that their involuntary recommitment, without a precommitment hearing and any written documentation of the reason for their recommitment, violates both New Jersey's civil commitment law, N.J.S.A. 30:4-27.1 to -27.23, and their due process rights under both the federal and state constitutions. B.L. and M.W. urge this court to enunciate clearly when a conditionally discharged patient may be rehospitalized and what procedures are required before an order of rehospitalization may be entered.
At the outset, a brief discussion of the purpose behind certain changes to the civil commitment law is helpful to understand the context in which conditional discharge, recommitment, and the due process rights of mentally ill patients should be reviewed. As discussed by our Supreme Court in In re D.C., 146 N.J. 31, 679 A.2d 634 (1996), in 1987, the Legislature passed a comprehensive civil commitment statute which sought to "create a public health system that provides professional treatment and services in a manner that `protects individual liberty and provides advocacy and due process for persons receiving treatment.'" Id. at 42, 679 A.2d 634 (quoting N.J.S.A. 30:4-27.1c).
Thus, the "findings and declarations" section of the law specifically states:
Because involuntary commitment entails certain deprivations of liberty, it is necessary that State law balance the basic value of liberty with the need for safety and treatment, a balance that is difficult to effect because of the limited ability to predict behavior; and therefore, it is necessary that State law provide clear standards and procedural safeguards that ensure that only those persons who are dangerous to themselves, to others or to property, are involuntarily committed.

[N.J.S.A. 30:4-27.1(b).]
The Court in In re D.C. further noted that R. 4:74-7 provides additional guidance in these cases and was implemented to "`correct a long standing history of procedural abuses in the civil commitment process and to ensure that no person may be involuntarily committed to a psychiatric institution without having been afforded full procedural due process.'" Id. at 43, 679 A.2d 634 (quoting Pressler, Current N.J. Court Rules, comment 1, on R. 4:74-7 (1995)).
Thus, the above language and history indicates that the protection of a person's due process rights was greatly important to the Legislature when it passed the 1987 changes to the civil commitment law. Against this backdrop, we turn first to a discussion of the specific statutory section at issue, N.J.S.A. 30:4-27.15(c), and second, to a discussion of whether due process requires a precommitment hearing and written findings detailing the reasons for the patient's rehospitalization.

*935 New Jersey's Civil Commitment Law

N.J.S.A. 30:4-27.15c(1) addresses conditional release. It states that a court may discharge a patient from involuntary commitment, "subject to conditions, if the court finds that the person does not need involuntary or continued involuntary commitment and the court finds:"
(a) that the patient's history indicates a high risk of rehospitalization because of the patient's failure to comply with discharge plans; or
(b) that there is substantial likelihood that by reason of mental illness the patient will be dangerous to himself, others or property if the patient does not receive other appropriate and available services that render involuntary commitment unnecessary.
N.J.S.A. 30:4-27.15c(3) addresses the situation where a patient discharged on conditional release fails to meet the imposed conditions. It provides as follows:
The designated mental health agency staff person shall notify the court if the patient fails to meet the conditions of the discharge plan, and the court shall issue an order directing that the person be taken to a screening service for an assessment. The court shall determine, in conjunction with the findings of a screening service, if the patient needs to be rehospitalized and, if so, the patient shall be returned to the facility. The court shall hold a hearing within 20 days of the day the patient was returned to the facility to determine if the order of conditional discharge should be vacated.
B.L. and M.W. argue that the respective mental health facilities monitoring them violated N.J.S.A. 30:4-27.15c(3) by involuntarily returning them to Ancora without first notifying the court, and in the case of M.W., recommitting her without evidence of a violation of her conditional release.
Both appellants point out that the statute clearly provides that if a mental health agency determines that a patient has violated the conditions of his or her release, then the agency "shall notify the court," and "the court shall issue an order directing that the person be taken to a screening service for an assessment." N.J.S.A. 30:4-27.15c(3) (emphasis added). B.L. and M.W. note that in their cases, the community mental health care workers (in the case of B.L.) and Ancora (in the case of M.W.) simply decided to rehospitalize them, without first notifying the trial court. Only after B.L. and M.W. had been recommitted was the court notified and a post-commitment hearing held within twenty days, as required by N.J.S.A. 30:4-27.15c(3).
They also point to Ancora's own policy manual which echoes N.J.S.A. 30:4-27.15c(3), and places the decision of recommitment with the court. In cases where a patient appears to be noncompliant with the conditions of his or her discharge, the manual states that the patient shall be evaluated at a designated screening service, which shall notify the court of its findings. The court shall then determine, in conjunction with the findings of the screening service, if the patient needs to be rehospitalized.
Because the statute plainly vests the decision to rehospitalize conditionally discharged patients in the trial court, N.J.S.A. 30:4-27.15c(3) was violated when B.L. was involuntarily rehospitalized on July 11, 2000, and when M.W. was involuntarily rehospitalized on September 16, 2000. Therefore, the summary involuntary rehospitalization of both B.L. and M.W. was improper and must be reversed.[6]
*936 Moreover, we are satisfied that involuntary rehospitalization of both B.L. and M.W. cannot be justified on these records because neither patient was considered dangerous. "To enter an order of involuntary commitment, the court must find by clear and convincing evidence that the patient is mentally ill and that the illness causes the patient to be dangerous to himself, others or property." In W.H., supra, 324 N.J.Super. at 523, 736 A.2d 529. Neither psychiatrist speaking at the hearings said that B.L. or M.W. met the standard for involuntary commitment when they were returned to Ancora.
B.L. and M.W. also assert that their rights under N.J.S.A. 30:4-27.15c(3) were violated when "[t]he designated mental health agency staff person," ibid., failed to submit "written on the record documentation when there [was] an allegation of non-compliance with conditions of release." We disagree. The statute only requires the "designated mental health agency staff person" to notify the court if a patient has failed to comply. It does not require that the notice be in writing. Moreover, in deciding whether a patient should be rehospitalized, the statute does not require the trial court to base its decision on a written report from the screening service or mental health facility. Instead, the statute only requires that the court shall make its determination "in conjunction with the findings of a screening service." Ibid. There is no statutory requirement that these "findings" be in writing.
As other provisions of the civil commitment law reveal, the Legislature clearly determined when to require a writing. N.J.S.A. 30:4-27.10a states that in order to involuntarily commit a person, a hospital or facility must submit to the court a clinical certificate completed by the patient's treatment team and the screening certificate which authorized the admission of the patient to the facility. Pursuant to N.J.S.A. 30:4-27.10b, an involuntary commitment may similarly be achieved if two clinical certificates, at least one of which is prepared by a psychiatrist, is submitted to the court. N.J.S.A. 30:4-27.2 defines "clinical certificate" to mean a form completed within three days of examination of the patient by the psychiatrist or other examining physician which states the specific facts upon which the examining physician has based his or her conclusion.
The section dealing with rehospitalization of conditionally discharged patients, N.J.S.A. 30:4-27.15c(3), makes no mention of clinical certificates, or any other writing. When "the Legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded." GE Solid State, Inc. v. Director, Div. of Taxation, 132 N.J. 298, 308, 625 A.2d 468 (1993); State v. Dela Rosa, 327 N.J.Super. 295, 301, 743 A.2d 336 (App.Div.), certif. denied, 164 N.J. 191, 752 A.2d 1293 (2000).
In sum, we conclude that both B.L. and M.W. were improperly rehospitalized because the applicable mental health facility failed to notify the court prior to their involuntary rehospitalization and the court did not order their rehospitalization. Therefore, the involuntary rehospitalization of both B.L. and M.W. are reversed. We do not conclude, however, that N.J.S.A. 30:4-27.15c(3) requires written documentation of the reasons for a conditionally discharged patient's rehospitalization. Notwithstanding the lack of such a statutory requirement, such documentation may still be required as a matter of constitutional due process. We discuss that next.

*937 III
B.L. and M.W. argue that their involuntary return to Ancora violated their due process rights. They contend that they were entitled to a precommitment hearing before being rehospitalized because their cases involved nonemergent violations which require a hearing prior to any recommitment. In addition, they argue that in any case involving the potential rehospitalization of conditionally discharged patients, due process requires: (1) a contemporaneous affidavit or written report from a person with personal knowledge of the facts of the alleged violation of the patient's condition, or at a minimum, the source of the information must be submitted to the court, the patient and his or her counsel; (2) a written court order with findings of fact and a determination that those facts justify a compliance hearing or a return to the hospital under the applicable legal standard; and (3) a plenary hearing as soon as one can be held.
In making these claims, B.L. and M.W. rely heavily on In re B.H., 212 N.J.Super. 145, 514 A.2d 85 (Law Div.1986). In that case, decided prior to the 1987 changes to the civil commitment law, the trial court outlined the procedures that should be followed when a conditionally discharged patient violates the conditions. The court issued the guidelines in the absence of any statutory authority, case law or court rules providing procedural guidelines. Id. at 149, 514 A.2d 85. The court devised a two track system, distinguishing between emergent situations, which would require only a postcommitment hearing, and nonemergent situations, which would require a precommitment hearing.
Appellants' reliance on In re B.H. is misplaced. As noted, it was decided prior to the changes to the civil commitment law. Consequently, the Legislature was presumably aware of In re B.H. when it enacted comprehensive changes to the civil commitment law in 1987. Not only did the Legislature have an opportunity to include In re B.H.'s procedures in 1987 and did not, but it also declined to do so in 1994. In 1994, N.J.S.A. 30:4-27.15c(3) was amended to clarify that the court must issue the order directing that a patient be taken to a screening service for an assessment. Assembly Bill No. A. 86 (Oct. 31, 1994).
Principles of statutory construction require "that a statute must be interpreted in light of its common law antecedents." Johnson Machinery Co., Inc. v. Manville Sales Corp., 248 N.J.Super. 285, 306, 590 A.2d 1206 (App.Div.1991). In addition, "`[a] legislative body in this State is presumed to be familiar not only with the statutory law of the State, but also with the common law.'" Magierowski v. Buckley, 39 N.J.Super. 534, 554, 121 A.2d 749 (App.Div.1956) (quoting Yanow v. Seven Oaks Park, Inc., 11 N.J. 341, 350, 94 A.2d 482 (1953)).
The legislative history to the 1987 changes indicates that the Legislature was aware of case law concerning involuntary commitment. See, Senate Revenue, Finance and Appropriations Committee, Statement to A. 1813 (Feb. 5, 1987) (stating that this bill "revises the statutes concerning involuntary civil commitment to reflect clinical and programmatic advances and to incorporate language based on recent court decisions and rules") (emphasis added); Assembly Appropriations Committee, Statement to A. 1813 (Dec. 11, 1986) (same); Assembly Health and Human Resources Committee, Statement to A. 1813 (Oct. 9, 1986) (same). In light of the legislative history indicating that the Legislature sought to enact a civil commitment statute that would incorporate "recent court decisions," we conclude that the Legislature consciously rejected In re B.H.'s two track system.
*938 Although not set forth in appellants' briefs, their challenge to lack of procedural due process is apparently based on both the Fourteenth Amendment of the United States Constitution and Article 1, Paragraph 1 of the New Jersey Constitution. It is well settled that because civil commitment impacts a patient's individual liberty, the power of the State in this area is constitutionally bounded by the principle of procedural due process. In re S.L., 94 N.J. 128, 136, 462 A.2d 1252 (1983). Due process, however, is a flexible concept. In re M.G., 331 N.J.Super. 365, 374, 751 A.2d 1101 (App.Div.2000). Not all situations that require procedural due process safeguards call for identical procedures. Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972).
Here, the question is what level of due process is required for a patient who has been conditionally discharged when his or her liberty is affected by continuing to comply with the conditions of discharge. Because a patient who violates his or her conditions is subject to involuntary rehospitalization, depending on the court's determination in conjunction with the findings of the screening service, N.J.S.A. 30:4-27.15c(3), the patient's liberty interest mandates procedural due process greater than that provided in both appellants' cases. Involuntary commitment to a psychiatric facility is "`a massive curtailment of liberty.'" Vitek v. Jones, 445 U.S. 480, 491, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552, 564 (1980) (quoting Humphrey v. Cady, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394, 402 (1972)). Involuntary civil commitment "effects a great restraint on individual liberty." In re S.L., supra, 94 N.J. at 137, 462 A.2d 1252.
We must consider and weigh three factors to determine what procedural due process protections are constitutionally required. Zinermon v. Burch, 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100, 115 (1990). The factors are: (1) the private interest affected by the governmental actions; (2) the risk of an erroneous deprivation of these interests through the procedures used, as well as the probable value, if any, of added procedural requirements; and (3) the government's interest and the extent to which it will be impeded by the use of additional safeguards. Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S.Ct. 893, 902-03, 47 L.Ed.2d 18, 33 (1976).
Clearly, B.L. and M.W.'s private liberty interests are substantial, even if a hearing is provided within twenty days after rehospitalization as provided by N.J.S.A. 30:4-27.15c(3). Vitek, supra, 445 U.S. at 491, 100 S.Ct. at 1263, 63 L.Ed.2d at 564. Even though a conditionally discharged patient's liberty is indeterminate, the patient is still free to enjoy "`many of the core values of unqualified liberty.'" In re True, 103 Idaho 151, 645 P.2d 891, 898-99 (1982) (quoting Morrissey, supra, 408 U.S. at 482, 92 S.Ct. at 2600, 33 L.Ed.2d at 495).
Under the second factor, the added requirements that B.L. and M.W. seek (precommitment hearing, written findings) clearly would reduce the risk of erroneously rehospitalizing a nondangerous, mentally ill person and better ensure that recommitment would be based on an accurate evaluation of the facts. That interest, however, must be balanced against the third factor, the governmental interest in expeditiously safeguarding the public from persons formerly adjudged to be dangerous and in need of commitment.
Balancing and weighing these factors leads us to conclude that procedural due process does not require a precommitment hearing for those patients that are involuntarily rehospitalized following the violation of their conditional discharge. We emphasize, however, that the recommitment *939 must be based upon the standard for the involuntary commitment of patients, that is, "the patient is mentally ill and that illness causes the patient to be dangerous to himself, others or property." In re W.H., supra, 324 N.J.Super. at 523, 736 A.2d 529. No other standard suffices. "[S]tablization" of a patient, which was the standard used to rehospitalize B.L., is insufficient.
Here, because N.J.S.A. 30:4-27.15c(3) requires a hearing "within twenty days of the day the patient was returned to the facility," the hearing aspect of procedural due process is satisfied for conditionally discharged patients. Returning a patient involuntarily to a hospital after he or she violates a condition of discharge means that the court has found by clear and convincing evidence that the patient is a danger to himself, others or property. "A post-deprivation hearing is appropriate and constitutionally permissible in such cases because the `threat of harm to the [individual] or others is of such a nature that confinement must take place immediately. When the choice is between a loss of life or health and a loss of liberty for a brief period of time, the preferable alternative is apparent.'" In re M.G., supra, 331 N.J.Super. at 377, 751 A.2d 1101 (quoting Coll v. Hyland, 411 F.Supp. 905, 910 (D.N.J.1976)).
Here, N.J.S.A. 30:4-27.15c(3) does not require a precommitment hearing, but does provide that rehospitalization can only occur if there is a judicial determination which is based, in part, on the findings of a screening service's assessment of the patient. Therefore, the statute does offer some safeguards against erroneous rehospitalizations by requiring a court to make the decision of recommitment. Appellants implicitly acknowledge this safeguard, noting that by requiring a clinical assessment and judicial determination, the statute "recognizes that there will be cases in which a person is not hospitalized and remains in the community."
Although we are satisfied that procedural due process does not require a precommitment hearing for conditionally discharged patients subject to the mandate of N.J.S.A. 30:4-27.15c(3), it does require other procedures that are not set forth in the statute. We conclude that due process requires that the findings of the screening service shall be in the form of a written certification. The certification shall provide: (1) the name of the hospital that conditionally released the patient; (2) the date of that release; (3) the designated mental health agency and the designated contact or staff person for the patient; (4) the violation of the condition or conditions committed by the patient; (5) the name of the screening service and the name of the person who performed the screening; and (6) the results of the screening, setting forth facts, observations and the basis for recommending that the patient be rehospitalized. This certification provides a written, factual basis for the court's resolution of the recommitment issue.
The certification shall be transmitted to the court so it can determine whether the standard for rehospitalization has been met. We recognize that in some instances it will be impractical to transmit the writing to the court. On those occasions, the screening service may communicate its findings to the court by telephone and the court shall memorialize the information in writing upon receipt. As soon as possible, the screening service shall send the certification to the court.
Further, the court's determination, following the receipt of the certification from the screening service, shall be in the form of an order, accompanied by findings of fact and conclusions of law as required by Rule 1:7-4(a). The certification *940 of the screening service and the court's order shall be served on the patient and his counsel at least ten days prior to any hearing required by N.J.S.A. 30:4-27.15c(3). We conclude that the above procedure is required because it is exceedingly arduous for a reviewing court, let alone the trial court, to evaluate the merits of an application to rehospitalize a patient without such a writing. It is also quite difficult for the patient to fairly challenge a rehospitalization determination at the subsequent hearing.
Clearly, in an initial involuntary commitment, clinical certificates and a written order are required. See N.J.S.A. 30:4-27.10(a)-(d) and (h); R. 4:74-7. See also In re True, supra, 645 P.2d at 903 (stating that due process required written notice to patient of reasons for and evidence relied on justifying rehospitalization); In re Richardson, 481 A.2d 473, 480 (D.C.1984) (stating that due process required submission of affidavit to court within twenty-four hours of return, reciting recent actions of patient and reasons for his or her return in sufficient detail).
We note that in appellants' cases, there is no documentation of the reasons for their respective rehospitalizations, making review of their cases difficult. No written record exists for either B.L. and M.W. detailing why they were rehospitalized on July 11, 2000 (for B.L.), and September 16, 2000 (for M.W.). The lack of such a record is particularly troublesome in B.L.'s case, since the trial court failed to review the merits of B.L.'s rehospitalization and concluded peremptorily that "[h]aving been brought back here, I assume it was appropriate."
Moreover, requiring such written documentation would take care of the hearsay problem in B.L.'s case. B.L. argues that at his July 28, 2000, hearing, Dr. Chheda relied on hearsay in support of the reasons for his recommitment. Specifically, Dr. Chheda stated that B.L. had stopped taking his medication and had taken a swing at someone in the emergency room. Dr. Chheda, however, never identified the source of this information, thereby precluding B.L. from any opportunity to challenge the reasons for his recommitment and preventing the trial court from evaluating the trustworthiness of the information. See In re J.B., supra, 295 N.J.Super. at 78-79, 684 A.2d 925 (holding that insufficient medical evidence existed to support commitment where testifying psychiatrist improperly based testimony on hearsay screening documents, psychiatrist had no knowledge of screener and testifying social worker relied on hearsay evidence provided by a non-testifying case manager); In re Raymond S., supra, 263 N.J.Super. at 433, 623 A.2d 249 (holding that insufficient evidence existed to support commitment where most of the testifying doctor's information came from conversations with "staff").
We also address another point required by procedural due process and the civil commitment law that was not raised by appellants. In both hearings, the record does not support that the psychiatrist who spoke was placed under oath. Under the civil commitment law, a hearing is an evidence-gathering proceeding. See N.J.S.A. 30:4-27.14. As such, witnesses must be sworn, particularly the psychiatrists. Without swearing in the witnesses, there are no proofs presented at the hearing. Due process requires that a court must have proofs, "which lead to the decision[.]" Callen v. Gill, 7 N.J. 312, 319, 81 A.2d 495 (1951).

IV
Both appellants argue that the trial court improperly ordered that they be placed on CEPP status, which continued *941 their involuntary stay at Ancora. We agree.
If a patient otherwise entitled to discharge cannot be immediately discharged due to the unavailability of an appropriate placement, the court shall enter an order conditionally extending the patient's hospitalization and scheduling a placement review hearing within 60 days thereafter.

[R. 4:74-7(h)(2).]
In In re G.G., 272 N.J.Super. 597, 605, 640 A.2d 1156 (App.Div.1994), we addressed situations similar to that here and held that orders of CEPP were improper when the patients were otherwise entitled to discharge and had living arrangements outside the hospital. There, three patients committed at Trenton Psychiatric Hospital were placed on CEPP status because the follow-up care portion of their discharge plans had not been completed, even though they were entitled to be discharged immediately. Id. at 602, 640 A.2d 1156. We said:
CEPP is not intended as a means for extending an involuntary commitment simply because the hospital has not yet arranged for the periodic follow-up care of a patient not found to be a danger to self, others or property. Using that erroneous approach here devalued appellants' constitutional right to liberty.

[Id. at 605, 640 A.2d 1156.]
Similarly, in these cases, the trial court improperly conditionally extended B.L.'s and M.W.'s hospitalization, even though they each had appropriate placements. The court ordered B.L.'s continued hospitalization until he was stabilized. Since B.L. had his own apartment, which constituted an appropriate placement, his continued hospitalization was improper. Because B.L. could not be rehospitalized for reasons of stabilization, B.L. was entitled to an immediate discharge on July 28, 2000.
The trial court also conditionally extended M.W.'s rehospitalization, subject to the condition that she be released to Goshen as soon as a bed became available. M.W. did not return to Goshen until four weeks later on October 22, 2000. A bed, however, was immediately available for M.W. because Goshen was required by regulation to maintain a bed for her while she was hospitalized. See N.J.A.C. 10:37A-9.7(c). Thus, M.W. was entitled to an immediate discharge.

V
We summarize the procedures that must be utilized when a patient has violated the conditions of his or her release. The designated mental health agency staff person must notify the court when a patient has violated the conditions. This notification does not have to be in writing. The court shall order the patient to be screened. The screening service shall conduct an assessment, the results of which shall be in a written certification. The certification shall provide: (1) the name of the hospital that conditionally released the patient; (2) the date of that release; (3) the designated mental health agency and the designated contact or staff person for the patient; (4) the violation of the condition or conditions committed by the patient; (5) the name of the screening service and the name of the person who performed the screening; and (6) the results of the screening, setting forth facts, observations and the basis for recommending that the patient be rehospitalized. This certification provides a written, factual basis for the court's resolution of the recommitment issue.
The certified screening document shall be transmitted to the court. If it is not practical to transmit the writing to the court, the finding of the assessment may be transmitted by telephone and shall be memorialized in writing by the judge upon *942 receipt. As soon as possible, the written certification shall then be sent to the court. The court shall determine, in connection with the certified findings of the screening service, whether to rehospitalize the patient. A patient can be rehospitalized only when the standard for initial commitment is satisfied. The court shall issue an order with its findings of fact and conclusion as required by R. 1:7-4(a).

VI
The orders under review are reversed.
NOTES
[1] We have combined these two cases for purposes of this opinion because the same issues are implicated.
[2] Dr. Chheda spoke at B.L.'s hearing but the record does not indicate that she was sworn.
[3] There was no court order entered returning B.L. to Ancora.
[4] The record does not indicate that Dr. Villanueva was sworn.
[5] There was no court order entered returning M.W. to Ancora.
[6] Because the court was not notified that appellants were returned to Ancora, no order recommitting them was ever entered.