874 A.2d 1075

IN THE MATTER OF CIVIL COMMITMENT OF E.D.

Argued February 15, 2005—Decided June 15, 2005.

538

*Joan D. Van Pelt,* Assistant Deputy Public Defender, argued the cause for appellant, E.D. (*Yvonne Smith Segars,* Public Defender, attorney; *Brian J. Neff,* Assistant Deputy Public Defender, on the brief).

*Mary Beth Wood,* Deputy Attorney General, argued the cause for respondent, State of New Jersey (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

Justice WALLACE delivered the opinion of the Court.

This appeal presents us with the opportunity to address a challenge to the procedures used to revoke a committee's conditional discharge and to recommit under the New Jersey Sexually Violent Predator Act, *N.J.S.A.* 30:4–72.24 to –27.38 (the Act). We upheld the constitutionality of the Act in *In re Commitment of W.Z.*, 173 *N.J.* 109, 801 *A.*2d 205 (2002). We now hold that due process requires the State to give the committee written notice of each asserted violation, and that prior to recommitment under the Act the State must prove by clear and convincing evidence the person is highly likely to reoffend.

I.

E.D. has an extensive history of committing sex offenses and other crimes. In September 1977, E.D. was charged with rape and assault with intent to rape. He was subsequently found guilty and evaluated at the Adult Diagnostic and Treatment Center (Avenel). At that time, the evaluation concluded that E.D. did not fall under the purview of the Sex Offender Act. In June 1978, the trial court imposed a fifteen-year sentence. In 1988, E.D. was sentenced to an eight-year prison term with a four-and-one-half year period of parole ineligibility for a robbery conviction. He was paroled in February 1994, and two months later, he was arrested and charged with burglary, aggravated sexual assault, sexual assault, aggravated criminal sexual assault, and criminal sexual contact. E.D. was convicted of criminal sexual contact and criminal mischief. In December 1994, the trial court imposed an eighteen-month prison sentence with a nine-month period of parole ineligibility.

In October 1995, three months after his release from prison, E.D., wielding a knife, approached a woman and demanded she remove her clothes. When she refused, E.D. attacked her with the knife and punched her in the face. The victim was able to escape. E.D. was later arrested and charged with attempted aggravated sexual assault, aggravated assault, criminal sexual

contact, and possession of a weapon for an unlawful purpose. He entered into a plea agreement with the State and pled guilty to aggravated assault in exchange for a probationary sentence. The trial court accepted the plea, imposed a probationary sentence, and dismissed the remaining charges. After E.D. violated probation in 1997, he received a five-year prison sentence.

Just prior to the expiration of his sentence in May 2000, the State filed a petition seeking to commit E.D. pursuant to the Act. The initial commitment hearing was not conducted until February 2001. Following that hearing, where both sides presented expert testimony, the trial court found E.D. was a sexually violent predator in need of commitment and committed him to the Special Treatment Unit (STU).

The first annual review hearing for E.D. occurred in February and April 2002. At that hearing, the State presented the testimony of Stanley Kern, M.D., and Glenn Ferguson, Ph.D., both of whom recommended continued commitment. In opposition, E.D. presented the testimony of Jeffrey Singer, Ph.D. At the conclusion of the hearing, the trial court found that the State failed to establish by clear and convincing evidence that E.D. continued to be a sexually violent predator and ordered his unconditional discharge.

E.D. previously had appealed from the initial decision ordering commitment, and the State appealed from the later decision ordering his release. In a reported decision, *In re Civil Commitment of E.D.*, 353 *N.J.Super.* 450, 803 *A.*2d 166 (2002), the Appellate Division panel affirmed both judgments, but remanded for the trial court to consider whether conditions should be placed upon E.D.'s discharge. The panel reasoned from *State v. Carter*, 64 *N.J.* 382, 316 *A.*2d 449 (1974), *overruled on other grounds by, State v. Krol*, 68 *N.J.* 236, 344 *A.*2d 289 (1975), and *State v. Fields*, 77 *N.J.* 282, 390 *A.*2d 574 (1978), that the legislative intent would be effectuated by releasing the committee "subject to intermediate levels of restraint." *E.D., supra*, 353 *N.J.Super.* at 455–56, 803 *A.*2d 166.

At the remand hearing, the trial court determined that E.D.'s release should be subject to multiple conditions. The court ordered that E.D. reside at the American Rescue Workers Mission Shelter (the Shelter) in Newark; comply with all rules and regulations of the Shelter; attend outpatient sex offender and substance abuse counseling; submit to random urine monitoring; attend Narcotics Anonymous (NA) and Alcoholics Anonymous (AA) meetings; and abide by the Conditional Discharge Community Supervision Agreement as prepared by the Parole Department.

E.D. was transported to the Shelter on December 4, 2002. He was given an appointment card listing the date and time of his first counseling session at Irvington Counseling Center (ICC), the telephone number of his social worker, Jenna Caccese, copies of the conditional discharge order, Megan's Law registration information, and the Community Supervision of Life (CSL) regulation. He was instructed to telephone Caccese every Friday. After E.D. failed to contact her on December 13, 2002, the Shelter scheduled a meeting between E.D. and Caccese for December 18, 2002. At that time, Caccese confronted E.D. with his failure to contact her as well as several other concerns she had with him.

In January 2003, E.D. told Caccese he wanted to leave and marry his fiancée. Relying on the Shelter's sixty day probation period, during which the residents are not to go out without escort, Cacesse advised E.D. to focus on making it through the first sixty days of his conditional discharge without making any non-court-ordered changes. Thereafter, if E.D. did well, she told him she would confer with the administration at STU and maybe then increase his privileges.

In early February 2003, E.D.'s parole officer advised him that the conditional discharge order did not permit him to leave the Shelter and that he needed permission before leaving. On February 6, 2003, Caccese informed the personnel at the Shelter that because E.D. had not complied with all of the conditions of his discharge during the first sixty days, his level of restriction must remain the same. That same day, E.D.'s parole officer informed

Caccese that E.D. left the Shelter and went unescorted to Paterson. Later that day, E.D. called Caccese and denied leaving the Shelter unescorted. E.D. also debated whether the court order required him to remain at the Shelter after sixty days. Caccese advised him that the court order made no reference to leaving the Shelter after sixty days and that until the judge approved his leaving, he must remain there. She told him to stay in contact with his attorney and that his next court appearance was on April 15, 2003.

Caccese then spoke to Bruce Cooper of the Shelter about reducing the level of E.D.'s restrictions. Cooper discouraged any reduction because of E.D.'s recent strange behavior that included incoherent babbling and "talking wildly about death and suicide." Cooper believed E.D. was not ready to leave the Shelter without an escort.

The next day, February 7, 2003, E.D. left the Shelter without permission because he believed that a sixty-day probation period was implied in his conditional discharge. On February 9, 2003, E.D.'s parole officer called E.D.'s girlfriend and sister trying to locate him. Although those efforts were unsuccessful, the girlfriend said that E.D. had visited her on Saturday, asked for money, and left after she refused to comply.

On February 10, 2003, the State sought an order pursuant to *N.J.S.A.* 30:4–27.32(c)(3), to return E.D. to STU; to confine him there until the court determined in conjunction with the assessment whether the order of conditional discharge should be revoked and E.D. returned to custody; and to hold a hearing on the issue of revocation within ten days of E.D.'s return to STU. E.D. was located and returned to the STU on the evening of February 10, 2003.

By letter dated February 13, 2003, counsel for E.D. requested written notice of "the exact terms of the conditional release that [E.D.] is being accused of having violated." Because no proceedings like this had occurred previously, counsel asserted that it was akin to a violation of probation hearing in criminal court, but

asked the deputy attorney general to explain the procedure at the upcoming hearing. E.D.'s counsel received no reply to her inquiry.

On February 27 and 28, 2003, E.D. was evaluated by Natalie Barone, Ph.D., a clinical psychologist at STU. A copy of Dr. Barone's report was delivered to E.D.'s counsel on Friday, February 28, 2003, the last weekday prior to the scheduled hearing date of Monday, March 3, 2003.

At the start of the hearing on Monday morning, the State outlined that it would show that E.D. failed to comply with the requirements of his conditional discharge. E.D.'s counsel asked the court to limit the evidence to the alleged violation identified in the order returning E.D. to STU, i.e., the assertion that E.D. had ceased residing at the Shelter. Counsel for E.D. emphasized that the State had not answered her letter requesting the exact terms of the conditional release that E.D. was accused of violating. The trial court denied that request, noting that counsel had received Dr. Barone's evaluation, which referred to a number of things that could be considered violations of E.D.'s conditional discharge. Thus, the trial court held that Dr. Barone's evaluation gave E.D. sufficient notice of the asserted violations and satisfied due process.

The State then presented the testimony of Dr. Barone, Senior Parole Officer Steven Paparazzi, and Caccese. E.D. presented testimony from an administrator at the Shelter, his sister, and his niece. Needless to say, the testimony presented conflicting evidence concerning E.D.'s conduct at the Shelter and his need for recommittal to STU. At the conclusion of the hearing, the trial court stated that additional information was needed before a final determination could be made. The court noted that it could not "find that [E.D.] was in substantial violation of his conditional release but [had] heard testimony that while out he regressed and it [could] be that recommitment under the statute is the way to go." The court found there was at least probable cause "that E.D. should be recommitted even without considering whether he vio-

lated the terms of his conditional release," and rescheduled the hearing in three weeks.

Prior to the ensuing hearing, E.D. was evaluated by three experts. At the March 27, 2003, hearing, Dr. Kern, a psychiatrist at the STU, opined that E.D. continued to demonstrate serious difficulty controlling his behavior and more particularly that it was highly likely he would not control his sexually violent behavior and would reoffend. Dr. Kern opined that E.D. was in need of commitment in a secure facility.

Dr. Amit, a psychologist at STU and a member of the Treatment Progression Review Committee (Committee), explained that the Committee met on March 5, 2003, to assess E.D.'s progress in treatment. Dr. Amit testified that the Committee believed that E.D. was in need of long-term treatment in an in-patient facility.

E.D. presented the testimony of Dr. Singer. He opined that E.D.'s substance abuse disorder was a significant and debilitating mental abnormality and that his antisocial personality disorder was almost as harmful. Dr. Singer concluded that continued treatment and monitoring would be necessary for E.D., but he found no substantial change since his evaluation preceding E.D.'s conditional release.

The court reviewed the evidence and found it was a mistake to have conditionally discharged E.D. Further, the court found that the evidence clearly demonstrated an unsuccessful adjustment and that E.D. left the Shelter without permission. The court concluded that the State established that E.D. continued to be a sexually violent predator and that he was highly likely to reoffend if not committed. The court ordered his recommitment and set a one-year review date.

E.D. appealed. In an unpublished opinion, the Appellate Division affirmed. The panel found that all of the trial court's findings were supported by sufficient and substantial evidence. Although the panel recognized deficiencies in the notice given to E.D. prior to his revocation hearing, it found the error to be harmless.

Regarding E.D.'s challenge to recommitment instead of some less drastic measure, the panel concluded that the trial court not only found that E.D. violated a term of his conditional discharge but that he was highly likely to reoffend if not committed.

We granted E.D.'s petition for certification. 182 *N.J.* 144, 861 *A.*2d 848 (2004).

## II.

In this matter we address the procedure that should be employed when there is a complaint that a person violated a term or terms of his or her conditional discharge. Specifically, we determine the content of the notice that the State is required to give the committee prior to a hearing for an asserted violation of the conditional discharge.

E.D.'s fundamental argument is that he was not provided with any clear and timely statement of the asserted violations that the Attorney General pursued at trial. E.D. does not challenge the procedures followed to return him to STU pending the hearing, but argues that the notice he received was deficient. Specifically, he claims that in the absence of notice of each asserted violation, his ability to prepare an adequate defense was substantially prejudiced in violation of his due process rights.

The State counters that due process does not require that E.D. be informed in writing of each specific violation of his conditional discharge. Further, the State argues that the notice given to E.D. fully complied with the mandate of *N.J.S.A.* 30:4–27.32(c)(3).

## III.

■ We begin our analysis by noting that " '[c]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.' " *W.Z.*, *supra,* 173 *N.J.* at 125, 801 *A.*2d 205 (quoting *Addington v. Texas,* 441 *U.S.* 418, 425, 99 *S.Ct.* 1804, 1809, 60 *L.Ed.*2d 323, 330–31 (1979)). In *W.Z.*, we emphasized that "the commitment process is bounded by constitu-

tional procedural guarantees and the scope of commitment is limited." *Id.* at 125–26, 801 *A.*2d 205.

The Act expressly directs that the court should be notified if a person who has been conditionally discharged fails to meet the terms of the discharge order. In that event,

> the court shall issue an order directing that the person be taken to a facility designated for the custody, care and treatment of sexually violent predators for an assessment. The court shall determine, in conjunction with the findings of the assessment, if the person needs to be returned to custody and, if so, the person shall be returned to the designated facility for the custody, care and treatment of sexually violent predators. The court shall hold a hearing within 20 days of the day the person was returned to custody to determine if the order of conditional discharge should be vacated.
>
> [*N.J.S.A.* 30:4–27.32(c)(3).]

Although the Act provides for notice, it does not indicate the content or the extent of such notice.

■ Due process requires that the person in question receive a notice that sufficiently defines the issue to permit him or her a fair opportunity to prepare and to defend against the accusation. *McKeown–Brand v. Trump Castle Hotel & Casino,* 132 *N.J.* 546, 559, 626 *A.*2d 425 (1993). The person should be informed in the notice about the asserted violation or violations to enable the preparation of a defense.

In the related area of mental health civil commitment, a panel of the Appellate Division recently addressed a similar issue. *In re Commitment of B.L.,* 346 *N.J.Super.* 285, 787 *A.*2d 928 (App.Div. 2002). In that case, B.L., a former mental health patient, had his conditional release revoked for a violation of the terms of his conditional release. *Id.* at 293, 787 *A.*2d 928. There was no evidence that the mental health agency notified the trial court that B.L. had violated a condition or that he was back in the hospital. *Ibid.* B.L. was involuntarily recommitted because he was not taking his medication and could not maintain himself. *Ibid.* He argued that the failure to receive any written documentation of the reason for his recommitment was a violation of his due process rights. *Id.* at 296, 787 *A.*2d 928. The Appellate Division concluded that when recommitment is sought for a person conditionally

discharged from civil commitment, that person is entitled to notice of "the violation of the condition or conditions [of discharge] committed by the patient" and the "facts, observations and the basis for recommending that the patient be rehospitalized * * * at least ten days prior to" a recommitment hearing. *Id.* at 305–06, 787 *A.*2d 928.

In the analogous context of a probation violation, *N.J.S.A.* 2C:45–4 provides that the hearing must be preceded by "written notice to the defendant of the grounds on which such action is proposed." We have noted that although "that statute does not mandate a timeframe for the provision of defendant's due process rights[,]" the act implies "that the notice be given as soon as possible and certainly in sufficient time to allow defendant to prepare and launch a defense." *State v. Nellom,* 178 *N.J.* 192, 203, 836 *A.*2d 807 (2003).

■ We are convinced that like the procedures utilized for hearings for mental health commitment and for violations of probation, the procedure for a hearing for violation of a conditional discharge under the Act must provide meaningful notice. At a minimum, to comply with the requirements of due process, prior to a revocation hearing under the Act, the person must be given written notice of each alleged violation sufficiently in advance of the court proceeding to provide a reasonable opportunity to pre-pare a defense. In essence, due process requires that notice be given of each alleged violation so the person may attempt to explain or refute the charges.

IV.

In the present case, the court entered an order directing that E.D. be returned to STU and that a full hearing be conducted within twenty days. *N.J.S.A.* 30:4–27.32(c)(3). The sole violation delineated in the order was that E.D. "is no longer residing at the America Rescue Workers Mission." Several days after the order was entered, counsel for E.D. wrote to the Attorney General's Office requesting a letter detailing the exact terms that E.D.

allegedly violated. The State did not respond to that letter, but it did deliver Dr. Barone's report to E.D.'s counsel late on Friday afternoon preceding the hearing on Monday. Subsequently, the trial court concluded that Dr. Barone's report provided an adequate substitute for detailed allegations from the State. We disagree.

■ The failure to provide E.D. with written notice of each asserted violation of his conditional discharge was a denial of his right to due process. Moreover, even if the State had informed E.D. that it intended to rely on Dr. Barone's report for additional allegations of a violation of his conditional discharge, the submission of that report was not timely. After all, defense counsel received Dr. Barone's report on Friday afternoon, and the hearing was scheduled for Monday morning. In short, E.D. was given neither sufficient notice nor adequate time to prepare and to defend against the State's allegation of his violation of the conditional discharge.

■ Although there were deficiencies in the notice received by E.D. that deprived him of his right to due process, they were subsequently cured when the trial court continued the hearing on March 27, 2003. The court recognized that the proofs did not establish that E.D. "was in substantial violation of his conditional release," but because there was evidence that E.D. had regressed to a point that he might be recommitted, a further hearing was required. At that time, E.D. had notice of the reasons the State claimed he violated his conditional discharge and that it sought to recommit him. Thus, on the facts presented, E.D. received sufficient notice of the charges and adequate time to prepare a defense prior to the final hearing.

V.

We turn next to E.D.'s argument that the Act does not set forth any standards to guide the trial court in ruling on an application to revoke a conditional discharge. E.D. contends that the United

State's Supreme Court holding in *O'Connor v. Donaldson*, 422 *U.S.* 563, 95 *S.Ct.* 2486, 45 *L.Ed.*2d 396 (1975), and this Court's holding in *Fields, supra*, 77 *N.J.* 282, 390 *A.*2d 574, should set the standard. We agree.

In *O'Connor*, the Supreme Court was presented with a due process challenge to the continued involuntary civil commitment of Kenneth Donaldson, an ostensibly schizophrenic mental patient, who was "neither dangerous to himself nor [ ] to others...." *Supra*, 422 *U.S.* at 573, 95 *S.Ct.* at 2492, 45 *L.Ed.*2d at 405–06. Faced with the question concerning every person's constitutional right to liberty, the Court held that "a State cannot constitutionally confine without more a nondangerous individual[.]" *Id.* at 576, 95 *S.Ct.* at 2494, 45 *L.Ed.*2d at 407. It was not "enough that Donaldson's original confinement was founded upon a constitutionally adequate basis ... because even if his involuntary confinement was initially permissible, it could not constitutionally continue after that basis no longer existed." *Id.* at 574–75, 95 *S.Ct.* at 2493, 45 *L.Ed.*2d at 406 (citations omitted).

In *Fields*, we were presented with the question of the entitlement of persons found not guilty by reason of insanity, who are subsequently committed, to "automatic periodic judicial review of the validity of the continued restraints upon their liberty on the basis of their dangerousness to themselves or others by reason of mental illness." *Supra*, 77 *N.J.* at 293, 390 *A.*2d 574. We concluded that "[d]ue process would seem to require a meaningful periodic review of the continued legitimacy of restraints on the liberty of all persons whose alleged dangerousness by reason of mental disability brought about these restrictions." *Id.* at 295, 390 *A.*2d 574. Further, we noted that we were in substantial accord with the United State's Supreme Court's analysis in *O'Connor*, and in response thereto, we instituted a civil practice rule mandating judicial review at reasonable intervals of orders for commitment and conditional release of civil committees. *Id.* at 297, 390 *A.*2d 574. We emphasized that the "standard of proof and the burden of meeting it at each periodic review hearing must be

identical to that required in the initial proceeding [to commit]. . . ." *Id.* at 295, 390 *A.*2d 574.

We also noted that different levels of restraint on the person's "liberty must proceed in gradual stages." *Id.* at 303, 390 *A.*2d 574. We made it clear that "[t]he determination of the suitable level of restraint is a matter entrusted to the sound discretion of the reviewing judge based on [ ] first-hand evaluation of the particular case and is one as to which [the judge] must be accorded a wide range of flexibility." *Ibid.* Further, we declared that "the outright release of the committee into the community without the use of any intermediate levels of restraint would normally constitute a manifestly mistaken exercise of the reviewing court's discretion." *Ibid.* (internal citation omitted).

■ Recently, we held that to support involuntary commitment of a sex offender under the Act, "the State must prove by clear and convincing evidence that the individual has serious difficulty controlling his or her harmful sexual behavior such that it is highly likely that the person will not control his or her sexually violent behavior and will reoffend." *W.Z., supra,* 173 *N.J.* at 133–34, 801 *A.*2d 205. We conclude that the same standard applies for a committee who has been given a conditional discharge and is alleged to have violated it. Thus, in order for the State to cause the recommitment of a committee who has been conditionally discharged, the State must establish by clear and convincing evidence that the committee is highly likely not to control his or her sexually violent behavior and will reoffend.

■ It should be obvious that clear and convincing proof of a violation of a term of conditional discharge will not necessarily mean that the State has satisfied its burden to recommit. The trial court may conclude that despite the proof of the violation, the same terms should be continued or other terms of conditional discharge should be imposed, and again place the committee on conditional discharge. It is the role of the trial court "to 'mold' an appropriate order based upon" the court's evaluation of the evidence. *Fields, supra,* 77 *N.J.* at 302, 390 *A.*2d 574.

 Here, the trial court found that E.D. continued to be a sexually violent predator. Based on the substantial evidence in the record, the court concluded that "it is, indeed, highly likely, that [E.D.] will recidivate[,]" and recommitted him to STU. Despite that conclusion, the trial court failed to express the standard of proof used in making its findings. Failing to do so was error. As we have explained, the standard of proof the State must meet is a clear and convincing one. The failure to set forth that the court's findings were based on clear and convincing evidence requires a remand.

## VI.

We make one final observation. The Act provides for annual reviews. We were informed at oral argument that because E.D. waived the annual review, he has not had a review since his recommitment in March 2003. Based on E.D.'s waiver of his right to a subsequent hearing or hearings, we harbor serious reservations whether the issues raised in this appeal are still ripe for decision. Nevertheless, because the issues discussed may reoccur, we have elected to address them. Any other issue raised in E.D.'s petition for certification that we have not addressed, we find moot.

## VII.

We reverse and remand for a hearing consistent with the views expressed herein.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA-SOTO—7.

*Opposed*—None.