949 A.2d 286 (2008)
401 N.J. Super. 111
In the Matter of the COMMITMENT OF T.J.
No. A-3179-06T1
Superior Court of New Jersey, Appellate Division.
Argued April 30, 2008.
Decided June 17, 2008.
*287 Lorraine M. Gormley, Assistant Deputy Public Advocate, argued the cause for appellant, T.J. (Ronald K. Chen, Public Advocate, attorney; Ms. Gormley, on the brief).
Thomas M. Bachman, Assistant Essex County Counsel, argued the cause for respondent, State of New Jersey, County of Essex (Harry J. Del Plato, Essex County Counsel, attorney; Mr. Bachman, of counsel and on the brief).
Before Judges CUFF[1] LISA and LIHOTZ.
*288 The opinion of the court was delivered by
LIHOTZ, J.A.D.
We examine the propriety of two orders requiring the conditional extension pending placement (CEPP) of appellant's involuntary civil commitment to the Trenton Psychiatric Hospital (TPH), pursuant to Rule 4:74-7(g). We conclude the trial court failed to make the proper legal findings to continue appellant's hospitalization. Accordingly, the orders dated January 11 and February 8, 2007, improperly infringed upon his constitutionally guaranteed liberty rights and must be reversed.
On April 18, 2006, appellant, T.J. was temporarily, civilly committed to the Ann Klein Forensic Hospital, West Trenton. He was transferred to the hospital from South Woods State Prison. T.J.'s incarceration was imposed following conviction for robbery and aggravated sexual assault, during which he blinded the victim. T.J. was never classified as a sexually violent predator (SVP), subject to civil commitment under N.J.S.A. 30:4-27.24 to -27.38. T.J. had a history of drug abuse. His civil commitment followed episodes in prison, which resulted in a diagnosis of chronic schizophrenia, paranoid type. While civilly confined, T.J. completed the maximum term of his criminal sentence.
On September 7, 2006, the trial court did not continue T.J.'s civil commitment but placed him on CEPP. R. 4:74-7(g). The judge also ordered the Special Status Patient Review Committee (SSPRC),[2] an administrative hospital committee, to determine the level of allowable privileges and the nature of any necessary restrictions due to T.J.'s mental health status and Megan's Law[3] conviction. T.J. was then transferred to the less restrictive Drake Building (Level 2 privileges) at TPH.
The court reviewed T.J.'s CEPP status on October 5 and November 2, 2006. Richard Povacz, T.J.'s treating social worker, submitted a request to the SSPRC in the hope it would approve T.J.'s transfer to a residence with Level 3 privileges. This would enable T.J. to enjoy home visits, grounds privileges, and supervised work opportunities. T.J.'s transfer to a less restrictive environment stalled while awaiting SSPRC action and an available placement.[4]
On January 4, 2007, T.J. was interviewed and authorized for placement in the Discharge Oriented Program (DOP). The DOP offered counseling and coping skills to ease a participant's return to the community. However, T.J.'s admission was subject to SSPRC approval.
At the time of the January 11, 2007 review hearing, T.J. remained housed in the Drake Building. The court had not received a report from the SSPRC.
Povacz again expressed his support for T.J.'s transfer from the Drake Building to a less restrictive Level 3 environment because he "had never been any problem," was always compliant with all medications, and was "very helpful." Povacz acknowledged *289 a current placement was not "available" because the SSPRC had not held a review hearing. Povacz believed a DOP bed was available, but transfer could not occur without SSPRC authorization.
Also, Povacz had submitted a discharge plan for T.J.'s release the prior week and it too, awaited SSPRC approval. The ultimate discharge plan for T.J. provided that he would reside with his father and step-mother in Newark.
T.J. expressed his frustration with being housed in a restrictive facility despite his progress and demonstrated ability to participate in extended privileges. T.J. requested immediate discharge to his parents' home with the understanding that he would continue his medication, attend any recommended after-care programs, schedule psychiatric care, and counseling.
L.W., T.J.'s father, wanted T.J. to be discharged and stated his son was "welcome" to reside in his home upon discharge. He stated he and his wife were prepared to provide daily supervision and assure T.J.'s attendance at his programs.
A review of the trial judge's determination on January 11, 2007, reveals her concern and caution exercised for T.J.'s benefit. The judge commented on T.J.'s Megan's Law status, which "was something that should be dealt with on a very cautionary basis" and "was complicated by the fact that [T.J.] had an extensive drug problem and certainly his use of drugs exacerbated the antisocial behavior that was at the root of these charges to begin with." The judge's aim was to prevent recidivism:
So I think it's very important, I've seen the revolving door too many times and I want [T.J.] to have every benefit because I really think, as I know that Mr. Povacz believes that this gentleman can succeed where we've seen all too many fail. But what we do know is that they need to have help and that help has to be in place prior to the discharge.
. . . .
[W]hat I was upset about was that it has been a long period of time before he has . . . been moved to a less restrictive setting, that's my concern. And . . . I'm not satisfied that [T.J.] is ready and that appropriate measures are in place in the community and the level of support that would protect the community as well as to assist [T.J.] is present as well as the SSPRC who essentially that's basically what they do is evaluate that.
I haven't heard from the SSPRC but just based upon the testimony that I have, and determine his level of restriction, the goal here is to discharge. The issue is when. Because of the Megan's law, there is an SSPRC and that's why we have them. Those are the experts. I want to hear from them and I want to hear from them soon.
So I am basically going to continue [T.J.'s] CEPP in light of all of those issues, I don't find at this point in time that there is an appropriate less restrictive setting for him in place until I have more information, more specific information.
And in light of his status and in light of his prior offenses . . . I certainly find that without that support system and without that level of supervision as well as support, that he could be, and I find by clear and convincing, that he could be a danger to others based upon information or to himself, but based upon others, based upon the prior criminal record and history of problems with drug abuse.
Although the judge denied T.J.'s request for discharge, she suggested he should be transferred to the DOP after SSPRC approval. CEPP status was continued for *290 two weeks pending a report from the SSPRC.
When the matter was relisted on January 25, 2007, Povacz advised the SSPRC had accepted the treatment team's recommendation for T.J.'s transfer to the DOP. The judge emphasized the importance of T.J.'s participation in the DOP to aid his adjustment upon release because he had been institutionalized for almost fourteen years.
The next review hearing was held on February 8, 2007. T.J. remained in the Drake Building and had not been transferred to the DOP because no beds were available. Povacz explained he was not able to arrange after-care planning because T.J. was not discharged. T.J., distressed by the inaction, reiterated his request to be discharged to reside in his father's home. L.W. acknowledged T.J. would be living with him and asked for his son to be discharged.
The trial judge again denied the discharge request, but authorized a four-hour offsite visit between T.J. and his parents. The judge's continued caution was expressed in her determination:
[T]here are three issues that I'm looking at. One issue is the fact of the Megan['s Law] status. Two . . . is the fact that there had been a prior history of substance abuse, for which [T.J.] successfully completed [a] MICA program and I commend you for that.
That's not to say that . . . you['ll] never go back there again because as we know, it's an ongoing situation. You have to fight every day. And the third, is the adjustment from being in an institution to being out in the outside world. [A]s well as your getting back to know your family and them getting back to know you and the whole thing.
But in my mind at this point in time, I think with all of those factors in mind, that I would be looking to a short period of conditional discharge but I do want to have things in place for that. And I would like to see how everything goes with the brief visits as well as I'm sure the family members would like to see how everything goes with the brief visits.
And in light of that, I think you are presently, and you have continued to be, and moved along with the least restrictive setting, every time you've come back, everyone is advocating for you to go to a least restrictive setting. . . .
So we're talking less than a month is what my hope is if we can get, you have to have a program in place. I want to have other things, that probably the social worker wants, at least to follow up with his Megan['s Law] status as well as with substance abuse. So I want all those things in place because you have the rest of your life and I want it to be great.
And yes, we are being cautious. Yes, you are being extremely patient. But I think with all those things in terms of CEPP that you have and everyone has been advocating for the least restrictive environment, and I would anticipate that hopefully your brief visits go well. You'll be conditionally discharged within a month.
The court's prediction of conditional discharge within one month did not occur. After the March 8, 2007 review, CEPP was continued until T.J.'s conditional release was granted on April 12, 2007. The terms of conditional discharged included: (i) compliance with prescribed medications; (ii) attendance at a five-day program at the Social Club House in Springfield, including a MICA counseling program and psychiatric outpatient treatment; (iii) attendance at a sex offender treatment program at the *291 Irvington Counseling Center along with monthly group sessions; (iv) abstention from substance abuse; (v) Megan's Law registration as required by N.J.S.A. 2C:7-2.1.
T.J. appeals from the January 11, 2007 and February 8, 2007 orders continuing his involuntary hospitalization. He argues the court misapplied its discretion by ordering CEPP in the absence of clear and convincing evidence that he represented a danger to himself, others or property. See N.J.S.A. 30:4-27.2(h) and (i).
Although T.J. is no longer involuntarily committed, his appeal is not mooted by his release. First, "when the patient remains liable for his or her hospital bill . . . a finding in the patient's favor will entitle the patient to a credit for any period of illegal commitment." In re Commitment of B.L., 346 N.J.Super. 285, 292, 787 A.2d 928 (App.Div.2002). Second, even if appellant had no liability for hospital costs, "we should nevertheless decide the issue because it implicates a committee's constitutional right to liberty. . . ." In re Commitment of G.G., 272 N.J.Super. 597, 600 n. 1, 640 A.2d 1156 (App.Div.1994).
The procedures to obtain an order for the involuntary civil commitment of a mentally ill person, set forth in N.J.S.A. 30:4-27.1 to -27.23 and Rule 4:74-7, are designed to balance a citizen's basic right to liberty with the State's police power to protect the community and its parens patriae power to care for citizens who are unable to care for themselves. N.J.S.A. 30:4-27.1(b); see Addington v. Texas, 441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323, 330-31 (1979). The overall objective is to provide said persons with "inpatient treatment and rehabilitation services in accordance with the highest professional standards and which will enable those hospitalized persons to return to their community as soon as it is clinically appropriate." N.J.S.A. 30:4-27.1(c).
For a court to continue its initial commitment order, the State must show by clear and convincing evidence that a committee is
in need of continued involuntary commitment by reason of the fact that (1) the patient is mentally ill, (2) mental illness causes the patient to be dangerous to self or dangerous to others or property as defined in N.J.S.A. 30:4-27.2h and -.2i, (3) the patient is unwilling to be admitted to a facility for voluntary care, and (4) the patient needs care at a short-term care or psychiatric facility or special psychiatric hospital because other services are not appropriate or available to meet the patient's mental health care needs.
[R. 4:74-7(f)(1).]
"The civil commitment process must be narrowly circumscribed because of the extraordinary degree of state control it exerts over a citizen's autonomy." In re S.L., 94 N.J. 128, 139, 462 A.2d 1252 (1983). "[O]ur Legislature and the New Jersey Supreme Court have promulgated statutes and rules to ensure that no person is involuntarily committed to a psychiatric institution without having been afforded procedural and substantive due process." In re Commitment of Raymond S., 263 N.J.Super. 428, 431, 623 A.2d 249 (App. Div.1993); In re Commitment of W.Z., 173 N.J. 109, 126, 801 A.2d 205 (2002).
Understanding we afford deference to the trial court's supportable findings, In re Commitment of J.P., 339 N.J.Super. 443, 459, 772 A.2d 54 (App.Div.2001) (citing State v. Fields, 77 N.J. 282, 311, 390 A.2d 574 (1978)), we have not hesitated to reverse involuntary commitments when the record failed to contain clear and convincing evidence of "a substantial risk of dangerous conduct within the reasonably foreseeable *292 future." S.L., supra, 94 N.J. at 138, 462 A.2d 1252 (quoting State v. Krol, 68 N.J. 236, 260, 344 A.2d 289 (1975)); In re Commitment of J.R., 390 N.J.Super. 523, 530, 916 A.2d 463 (App.Div.2007); In re Commitment of M.C., 385 N.J.Super. 151, 162, 896 A.2d 495 (App.Div.2006); B.L., supra, 346 N.J.Super. at 304, 787 A.2d 928; Raymond S., supra, 263 N.J.Super. at 433-34, 623 A.2d 249.
Here, we do not examine T.J.'s initial commitment, which presumably complied with N.J.S.A. 30:4-27.10(c) and (h), the statute that addresses the involuntary commitment of an inmate in need of care who is scheduled for release upon expiration of a maximum term of incarceration. T.J.'s challenge is directed to the continued hospitalization pursuant to CEPP, despite the court's finding that he did not demonstrate dangerousness.
Further, we do not take issue with the court's initial September 7, 2007 order for CEPP that requested review of T.J.'s status by the SSPRC. We have "declared that `the outright release of the committee into the community without the use of any intermediate levels of restraint would normally constitute a manifestly mistaken exercise of the reviewing court's discretion.'" In re Civil Commitment of E.D., 183 N.J. 536, 551, 874 A.2d 1075 (2005) (quoting Fields, supra, 77 N.J. at 302, 390 A.2d 574). We conclude that determination was appropriate after consideration of the presented facts and circumstances. However, when faced with the SSPRC's inexplicable four-month delay in providing any review of T.J.'s needs, the trial court continued the use of CEPP, instead of considering discharge, stating T.J. must first advance "through the levels" to be "a success story." The question for our review is whether CEPP was properly employed in this instance.
In the court's discretion, CEEP may be used, in discrete circumstances, to continue hospitalization of a committee
[i]f a patient otherwise entitled to discharge cannot be immediately discharged due to the unavailability of an appropriate placement, the court shall enter an order conditionally extending the patient's hospitalization and scheduling a placement review hearing within 60 days thereafter. If the patient is not sooner discharged, a second placement review hearing shall be held no later than six months after the initial placement review hearing and subsequently at no greater than six-month intervals.
[R. 4:74-7(h)(2).]
The Supreme Court first addressed whether the State could retain a mental health patient who qualified for discharge, but "who could not survive independently outside the institution without some care and supervision," in S.L., supra, 94 N.J. at 132, 462 A.2d 1252. Many of the patients in S.L. had been psychiatrically hospitalized for decades. Id. at 131, 462 A.2d 1252. Although mentally ill, they were not dangerous and were too ill or infirm to provide for their daily needs. Ibid. Thus, they were incapable of survival without continuous post-release care. Ibid. The Court's determination addressed the State's obligation to provide further care for these helpless patients, rather than to merely "cast them adrift into the community." Id. at 140, 462 A.2d 1252. The use of CEPP was approved to respond to the special needs of these special patients. Ibid. The Court held that the continued confinement on a provisional or conditional basis, done "of necessity," was a proper exercise of the State's parens patriae authority for the well-being of a committee. Ibid.
The Court was well aware that the State's use of CEPP "in the process of *293 arranging for appropriate placement" exerted "substantial control over the individual's life and liberty." Ibid. Therefore, this continued curtailment of an individual's liberty interest would only result upon a finding that the committee is "incapable of survival on [his] own." G.G., supra, 272 N.J.Super. at 604, 640 A.2d 1156.
A less restrictive means of assuring proper continued care without the same liberty infringements imposed by hospitalization is a conditional discharge, guided by N.J.S.A. 30:4-27.15(c). The statute provides:
(1) The court may discharge the patient subject to conditions, if the court finds that the person does not need involuntary or continued involuntary commitment and the court finds:
(a) that the patient's history indicates a high risk of rehospitalization because of the patient's failure to comply with discharge plans; or
(b) that there is substantial likelihood that by reason of mental illness the patient will be dangerous to himself, others or property if the patient does not receive other appropriate and available services that render involuntary commitment unnecessary.
(2) Conditions imposed pursuant to this section shall include those recommended by the facility and mental health agency staff and developed with the participation of the patient. Conditions imposed on the patient shall be specific and their duration shall not exceed 90 days unless the court determines . . . that the conditions should be imposed for a longer period.
Respondent County of Essex (Essex) argues T.J.'s past history, which included criminal behavior, drug use, and commission of a Megan's Law offense, necessitated a gradual change in restrictions, not conditional discharge. Citing Fields, supra, Essex maintains "even where the committee's condition shows marked improvement, only the most extraordinary case would justify modification in any manner other than by a gradual de[-]escalation of the restraints upon the committee's liberty." 77 N.J. at 303, 390 A.2d 574. Further, Essex contends the court properly maintained CEPP while awaiting the expertise of the SSPRC to recommend an appropriate placement. Unlike the patients in other reported cases that examine the use of CEPP, Essex states T.J. required specialized placements to support needs in addition to mental health and the long-term effects of institutionalization. Thus, Essex maintains this case presents unique circumstances that mandated the use of CEPP until an appropriate placement was solidified.
We agree with Essex there are no reported cases that squarely address the use of CEPP for a mental health patient who has committed a violent crime and a sex offense, but who is not a SVP. However, we disagree that prior pronouncements on the restrictive use of CEPP do not apply to this instance. We conclude the State's burden to justify the continued involuntary commitment or the use of a less restrictive curtailment of individual liberty through CEPP is no different for T.J., whose mental illness contributed to past violent criminal behavior, including a sexual assault, than it is for any other patient who has not committed a violent crime or sexual offense. Fields, supra, 77 N.J. at 293-94, 390 A.2d 574; Krol, supra, 68 N.J. at 250, 344 A.2d 289.
The Supreme Court unambiguously stated the use of CEPP is justified when immediate discharge cannot be accomplished "due to the unavailability of an appropriate placement." R. 4:74-7. Thus, "it becomes the task of the reviewing judge [] to `mold' an appropriate order *294 based upon his [or her] evaluation of the level of restraints dictated by the committee's present condition." Fields, supra, 77 N.J. at 302, 390 A.2d 574. Due process requires meaningful review of the individual's need to assure the least restrictive curtailment of liberty while properly protecting the public.
It is clear the trial judge sought to rely on the SSPRC's report to assess T.J.'s "appropriate placement" upon discharge.
An "appropriate placement" referred to in the Rule and in S.L. [supra,] is a placement in a facility that will provide continuing support and assistance through the day to mentally ill people who are "incapable of survival on their own." The Court described such a place as a "facility" that would provide "the needed level of care in the least restrictive manner[.]" [94 N.J.] at 140-41, 462 A.2d 1252.
An "appropriate placement" does not refer to a community mental health agency that provides periodic follow-up care, such as a step program or the administration of medicine, no matter how important that care may be to the committee's well-being.
[G.G., supra, 272 N.J.Super. at 604-05, 640 A.2d 1156.]
Although T.J.'s mental health and criminal history posed a specialized need for post-discharge aftercare, there is no evidence these needs warranted admission to a residential facility. Rather, as demonstrated by the order of conditional release, all that was required was outpatient counseling programs for mental health, sex offender treatment, and prevention of drug and alcohol abuse.
T.J. had available living arrangements outside the hospital. L.W. and his wife arranged to provide daily supervision to assure T.J.'s successful reintegration to society. Regardless of the court's expressed desire for T.J. to achieve a smooth adjustment and transition into the community, no evidence was presented to sustain a finding that he could not properly survive or function living in the community with his father under parental supervision. The standard established in S.L., that the committee would be "incapable of survival on [his] own," was not met. S.L., supra, 94 N.J. at 140, 462 A.2d 1252.
So too, the trial court's fear of T.J.'s potential relapse without specific aftercare placements designed by the SSPRC, however well-intentioned, is legally insufficient to continue his hospitalization. J.R., supra, 390 N.J.Super. at 530, 916 A.2d 463. The trial judge abrogated the responsibility to perform an independent check on whether confinement was appropriate when faced with inaction by the SSPRC. In re Commitment of D.M., 313 N.J.Super. 449, 454, 712 A.2d 1277 (App.Div.1998).
We have stressed that "CEPP is not intended as a means for extending an involuntary commitment simply because the hospital has not yet arranged for the periodic follow-up care of a patient not found to be a danger to self, others or property." [G.G., supra, 272 N.J.Super.] at 605, 640 A.2d 1156]. And, we have cautioned that use of "that erroneous approach . . . devalue[s] [the patient's] constitutional right to liberty." Ibid. We reaffirmed those principles in B.L., supra, 346 N.J.Super. at 308, 787 A.2d 928. Thus, CEPP is not a fallback option when the [S]tate cannot implement a discharge plan within forty-eight hours, and CEPP is not a means through which the judge may delay a conditional release.
[M.C., supra, 385 N.J.Super. at 162, 896 A.2d 495.]
*295 We agree with T.J. that the court, although motivated to assure his absolute "success," misapplied its discretion when continuing CEPP. At the January 11, 2007 review hearing, T.J. fulfilled all requisites for discharge: he completed his maximum criminal sentence; he was properly medicated and fully compliant and no longer suffered the problems posed by his mental illness; he attended all therapy and followed any recommendations; he demonstrated no disruptive, violent or aberrant behaviors; and he was patient, cooperative, and helpful despite his unwavering desire to be released. T.J. recognized his need for and responsibility to attend continued psychotherapy, abstention from drugs and alcohol, and the requirements of Megan's Law registration. He exceeded all expectations as he remarkably progressed in the programs he was permitted to attend. Both T.J. and his parents demonstrated an awareness of and a desire to implement appropriate aftercare programs.
The SSPRC administrative delay of almost five months rendered impotent the recommendation for T.J.'s less restrictive confinement, his gradual integration to the community, and the implementation of a discharge plan. T.J.'s extended confinement in the Drake Building was not justified and resulted from convenience because of the inefficiencies of the SSPRC.
The trial court's critical finding to justify CEPP that appropriate measures in the community were not in place at "a level of support that would protect the community as well as to assist T.J." cannot be supported by adequate, substantial and credible evidence. Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974). An appropriate placement in his father's home was available and community adjustment certainly was not fulfilled by retention in the Drake Building. Conditional release should have been used to provide a permissible means for requiring continued medication compliance, Megan's Law registration, substance abuse abstinence and counseling, and continued psychotherapy.
Reversed.
NOTES
[1] Judge Cuff did not participate in oral argument. However, with the consent of counsel, she has joined in this opinion. R. 2:13-2(b).
[2] The SSPRC provides review of recommendations made by a patient's treatment team balancing the patient's need to "successfully participate in treatment and rehabilitative programs, while maintaining a safe and secure therapeutic milieu for patients and staff. . . ." N.J.A.C. 10:36-1.1.
[3] N.J.S.A. 2C:7-1 to -11.
[4] The record regarding SSPRC action is unclear. Following the September 2006 review hearing, but prior to the January 11, 2007 hearing, references suggest the SSPRC modified T.J.'s status to Level 2. SSPRC modification to Level 3 and approval for the DOP at the TPH Lincoln Complex did not occur until sometime after the January 11, 2007 hearing.