# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1238-22

IN THE MATTER OF THE
CIVIL COMMITMENT OF
J.P.[1]

_____

Argued February 14, 2024 – Decided May 8, 2024

Before Judges Currier and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. MECC00094522.

Vanessa Fiore, Assistant Deputy Public Defender, argued the cause for appellant J.P. (Jennifer Nicole Sellitti, Public Defender, attorney; Vanessa Fiore and Cynthia Seda-Schreiber, Deputy Public Defender, on the briefs).

Michael Anthony Amantia, Assistant County Counsel, argued the cause for respondent State of New Jersey (Paul R. Adezio, Mercer County Counsel, attorney; Michael Anthony Amantia, on the brief).

PER CURIAM

---

[1] We use initials pursuant to Rule 1:38-3(f)(2).

Appellant J.P. appeals from the November 16, 2022 civil commitment order that continued his involuntary commitment and denied his request to convert to voluntary admission status. The court found J.P. did not have the capacity to make an informed decision regarding a change to his status as required under Rule 4:74-7(g)(1). We affirm.

J.P. was admitted to Capital Health Regional Medical Center on October 21, 2022 after attempting to commit suicide by jumping in front of an oncoming train. The severe injuries required the amputation of both legs.

J.P. had prior diagnoses of bipolar mood disorder, multiple sclerosis, cannabis use disorder, and chronic alcohol abuse. He had been hospitalized multiple times between July 2022 and these events in October 2022. In July 2022, J.P. ingested anti-freeze and received inpatient psychiatric care for approximately one month. In August, he was admitted to Capital Health for inpatient psychiatric care after voicing suicidal thoughts about planning to jump in front of a train. He was also treated at other facilities. J.P. was last admitted to the hospital approximately a week before these events.

After the October 21, 2022 admission, J.P. was screened regarding his mental health status and two psychiatrists completed certificates for his involuntary commitment—Nayan Bhatia, M.D., and Mohammad M. Bari, M.D.

2

During the screening, J.P. stated he had been living at the Rescue Mission, and he went to the train station to take his life. He did not know if he was intoxicated and "only remember[ed] waking up in the hospital with both legs amputated."

Dr. Bhatia indicated in his certificate that J.P. expressed "[s]uicidal ideation with no specific plan at this time," and his insight and judgment were poor. Dr. Bhatia concluded that J.P. was dangerous to himself because of his suicide attempt, his continued suicidal ideation, and his inability to satisfy his essential medical care and shelter needs because he was "depressed" and "unable to take care of [him]self due to decompensated psychiatric illness." Dr. Bhatia recommended inpatient care.

Dr. Bari found that J.P. exhibited "unpredictable" and "impulsive behavior." He also found J.P.'s insight and judgment were poor, and he would be a danger to himself because of his suicide attempt and his inability to satisfy his essential medical care and shelter needs. He recommended that J.P. receive inpatient psychiatric care.

The court ordered J.P. be temporarily involuntarily committed to Capital Health. During the initial hearing on November 16, 2022, J.P. requested his

status be converted to a voluntary commitment. County Counsel opposed the application.

At the hearing, Dr. Bhatia testified that J.P. understood he struggled with depression, and acknowledged he did not complete outpatient treatment or take his medication after being discharged from hospitalizations. Dr. Bhatia noted the prescribed medications had not been effective and despite his hospitalizations, J.P. had not improved. Dr. Bhatia considered J.P. a danger to himself because of his suicidal ideations and attempts. J.P. did not have a family support system and continued to voice suicidal thoughts. Dr. Bhatia thought that J.P. understood the need for psychiatric treatment, but he did not understand the consequences of not taking his medication.

On cross-examination, Dr. Bhatia acknowledged J.P. had been diagnosed with bipolar mood disorder but said "[i]t hasn't been fully established that he has bipolar [mood] disorder. . . . It's still a work in progress as to what exactly his diagnosis is." Dr. Bhatia stated that J.P. wanted to try Electroconvulsive Therapy (ECT), although the doctor was not sure how much J.P. knew about ECT. According to the doctor, J.P. could not answer why he stopped taking his medication after prior discharges, but he had expressed the desire to continue treatment.

During J.P.'s testimony, he stated he did not follow up with his treatment or medications after being discharged, although he would seek treatment again. J.P. stated his brother supported him "[i]n a way," but did not provide any details. J.P. confirmed he wanted to try ECT.

On cross-examination, J.P. admitted he did not know where he would be living in thirty or forty days. He conceded that even though he was able to fill his prescriptions while he was living at the Rescue Mission, he did not continue taking them. J.P. said he knew that if he did not take his medication, he "would go back to square one"; however, he felt his condition had not improved with the medicine. He stated he still felt depressed and had suicidal thoughts when taking the medication and he did not think that stopping the prescriptions would make a difference.

The court issued an oral decision, finding that J.P. satisfied the criteria for involuntary commitment and was a danger to himself "based upon the recent incidents and the prior suicide attempts." The court stated J.P. did not have "the capacity to make the determination regarding his continued health treatment in the hospital." The court noted J.P. had suicidal ideations, had attempted to commit suicide which resulted in the amputation of his legs, and that he did not

5

comprehend the consequences of not taking his medication. The court memorialized its decision in a November 16, 2022 order.

On appeal, J.P. contends the court erred in denying his application for a conversion to voluntary commitment as the State did not prove he lacked capacity to make the determination regarding his commitment status.

Rule 4:74-7 governs the civil commitment of adults. "[A]ppellate review of a commitment determination is extremely narrow and should be modified only if the record reveals a clear mistake." In re D.C., 146 N.J. 31, 58 (1996). We give the "utmost deference" to a trial court's decision and only modify it if there was an abuse of discretion. In re Commitment of J.P., 339 N.J. Super. 443, 459 (App. Div. 2001) (quoting State v. Fields, 77 N.J. 282, 311 (1978)). As long as the trial court made "supportable findings," its decision should be affirmed. In re Commitment of T.J., 401 N.J. Super. 111, 119 (App. Div. 2008). However, "we have not hesitated to reverse involuntary commitments when the record failed to contain clear and convincing evidence of '"a substantial risk of dangerous conduct within the reasonably foreseeable future."'" Ibid. (quoting In re Commitment of S.L., 94 N.J. 128, 138 (1983)).

To involuntarily commit an individual, the State must comply with N.J.S.A. 30:4-27.2(m) and establish (1) the individual has a mental illness; (2)

their mental illness must cause them to be dangerous to themselves, others, or property; (3) they must be "unwilling to accept appropriate treatment voluntarily after it has been offered"; and (4) they must need outpatient or inpatient care because other services are not available or would not adequately meet their needs. Rule 4:74-7(f)(1) tracks the statute in setting forth the same criteria.

In its oral decision, the court found that J.P. should be involuntarily committed because he suffered from bipolar mood disorder and was a danger to himself because of his suicide attempts. The court also found J.P. did not understand the consequences of not taking his medication and stopped taking his medicine each time he was discharged from inpatient treatment. Therefore, although J.P. accepted treatment when hospitalized, he did not continue treatment or medication after discharge. We are satisfied the State met its burden to involuntarily commit J.P. and the court did not abuse its discretion in ordering the commitment.

We turn to J.P.'s contention that he should be converted to voluntary commitment status. Under N.J.S.A. 30:4-27.2(ee), a voluntary admission is appropriate when an individual (1) has a mental illness; (2) their mental illness causes them to be dangerous to themselves, others, or property; (3) they are "willing to be admitted to a facility voluntarily for care"; and (4) they "need[]

7

care at a short-term care or psychiatric facility because other facilities or services are not appropriate or available to meet [their] mental health needs."

Under Rule 4:74-7(g)(1), an involuntarily committed individual can request to be converted to voluntary status. A court must then "hold a hearing within [twenty] days to determine whether the patient had the capacity to make an informed decision to convert to voluntary status and whether the decision was made knowingly and voluntarily." Ibid.

A voluntarily committed patient has the right to be discharged upon request. N.J.S.A. 30:4-27.20. The discharge must take place within forty-eight hours of their request unless the treatment team decides to initiate court proceedings to involuntarily commit the individual. Ibid.

It is clear, under the applicable statutes, that a person cannot convert to voluntary status unless they have the capacity to make a voluntary and knowing decision and they are willing to receive voluntary care. N.J.S.A. 30:4-27.1(a) and 27.2(m) establish "that a person should be involuntarily committed only when the mentally ill person does not seek treatment of his own volition." In re M.D., 251 N.J. Super. 19, 23 (Ch. Div. 1991). J.P. freely conceded he did not seek treatment when he was not hospitalized and he did not take medication,

even when he had filled prescriptions. J.P. was not willing to receive voluntary care.

In addition, we cannot conclude the court abused its discretion in finding J.P. did not have the capacity to make the knowing decision regarding his commitment status. Dr. Bhatia stated J.P. did not understand the importance of taking his medication because he stopped taking it when he left the hospital. Not understanding the need for the medication establishes a basis for a lack of capacity finding. In addition, the judge found J.P. was a danger to himself. There was not just suicidal ideation—he had jumped into the path of an oncoming train just days before.

We discern no basis to disturb the order of continued involuntary commitment.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1238-22