# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0141-23

IN THE MATTER OF THE
CIVIL COMMITMENT OF J.G.

_____

Argued December 3, 2024 – Decided January 16, 2025

Before Judges Smith, Chase and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Docket No. BUCC-000642-23.

Brian P. Hughes, Assistant Deputy Public Defender, argued the cause for appellant J.G. (Jennifer N. Sellitti, Public Defender, attorney; Brian P. Hughes, on the briefs).

James K. Grace argued the cause for respondent State of New Jersey (Malamut and Associates, LLC, attorneys; James K. Grace, on the brief).

PER CURIAM

J.G. appeals from the September 14, 2023 order continuing her involuntary civil commitment at Buttonwood Hospital (Buttonwood) and the September 28 order conditionally extending the commitment pending

appropriate placement. Based on our review of the record and prevailing law, we affirm in part and remand in part.

I.

We discern the salient facts from the record. On September 3, 2023, J.G. was brought to Virtua hospital for an involuntary screening after making several calls to police exhibiting delusional thoughts and paranoia, repeatedly claiming someone was entering her house without any evidence of intrusion being found. J.G.'s initial screener concluded "the danger presented by [J.G.] is imminent," as she displayed levels of "psychosis, bizarre behavior, paranoia and delusional thoughts" and was unable to care for herself. At that time, J.G. was extremely delusional, believing she was being stalked and her finances were hacked. She was also not eating or drinking as she believed that her food and drink were being tampered with by unseen individuals. After personally examining J.G., the attending clinician concluded she suffered from mental illness and, if not involuntarily committed, J.G. would be a danger to herself.

Two days later, J.G. was transferred to Buttonwood where she was examined by Dr. Akhil Sethi. Based on his examination and review of her medical records, Dr. Sethi concluded J.G. had schizoaffective disorder and was suffering from paranoid delusions. J.G.'s hospitalization at Buttonwood was

based on medication non-compliance. Later that day, Dr. Sethi filed an application for involuntary commitment, finding that J.G. was an imminent danger to herself.

Dr. Sethi prepared a report discussing J.G.'s admission to the hospital, psychiatric history, diagnoses, and his treatment recommendations. Dr. Sethi opined that J.G. should be involuntarily committed because "the danger presented by [J.G. was] imminent" and "involuntary outpatient treatment [was] not sufficient to render the patient unlikely to be dangerous in the reasonably foreseeable future."

An involuntary commitment hearing was conducted on September 14 where Dr. Sethi testified that J.G. had a long-standing history of psychotic illness. He testified that J.G. began taking her medication again but stopped and was in the process of medication override since she had poor insight into her illness, refusing to believe she had mental health issues. Dr. Sethi's testimony established that if she was immediately discharged, J.G. would be unable to provide her own shelter, medical care, and nourishment. He further opined J.G. ardently believed her false ideations that someone was trying to break into her home, which may lead her to live outside. Prior to September 3, J.G. had been living in supportive housing for ten years. Dr. Sethi testified

3

J.G. is unable to have "meaningful, constructive, reasonable conversation" and was a danger to the public because of the number of times she has called the police.

Dr. Sethi testified J.G. was unaware of what belongings she brought to Buttonwood and accused someone at the hospital of stealing her Social Security card and driver's license. Hospital records indicated she brought documents to Buttonwood, which J.G. asserted could not be located. The trial court found the county had not established that J.G. did not bring the allegedly missing documents with her to Buttonwood.

Dr. Sethi recommended stabilizing J.G.'s mental health with the help of medication management and then to link her back with outpatient services. In the meantime, Dr. Sethi testified continued involuntary commitment was necessary since there was no less restrictive environment that would meet her needs and ensure her safety. After the hearing, the trial court concluded

> I'm satisfied that what has been demonstrated here is consistent with paranoia . . . I'm satisfied at this time that when Dr. Sethi indicates that . . . even with the treatment team as recently as yesterday [J.G.] cannot engage in a conversation, I'm satisfied at this time [J.G. is] a danger to herself. I'm further satisfied that [J.G. is] just not functional. I'm further satisfied at this time [J.G.] cannot be treated in a less restrictive setting. The [d]octor has indicated . . . with

4

medication [J.G.] can . . . reach a stage where she can be discharged . . . back to supportive housing.

The trial court also found the county had not established J.G. would not provide shelter for herself, prior to the hospitalization as she was living in supportive housing despite her mental illness.

Based on the proofs, the trial court ordered continued commitment with a two-week review hearing scheduled for September 28. The next day, J.G. filed a notice of appeal.

At the September 28 review hearing, Dr. Sethi testified J.G.'s condition had not improved since admission, and recommended further involuntary commitment due to continued paranoia placing herself and others in danger. Dr. Sethi testified J.G.'s medication was changed but she refused to take the new medication, claiming it stressed her out, and the stress ultimately caused her blood pressure and heart rate to go up. Dr. Sethi further testified

> [J.G.] continues to be paranoid and has poor insight into her illness. [J.G.] has been cheeking medication despite being on medication override, has given me conflicted answers at various times, repeating things that she may have admitted before. In many ways, trying to do—say the things that can lead [J.G.] to a discharge rather than focusing on treatment here. Since [J.G.'s] fixation and paranoia persist[] . . . we have not made much progress.

A-0141-23

On cross-examination, Dr. Sethi again opined J.G. is paranoid and if the paranoia persists, she will continue to place herself and others in danger.

The trial court found the county had not shown by clear and convincing evidence that J.G. was dangerous to herself, to others or to property and was not in need of continued involuntary commitment, despite having concerns for her dangerousness. The trial court entered an order conditionally extending her hospitalization pending placement (CEPP) in appropriate housing.[1]

A few days later, J.G. filed an amended notice of appeal to include the CEPP order.

## II.

We review the trial court's decision to continue an individual's civil commitment under an abuse of discretion standard. See In re D.C., 146 N.J. 31, 58-59 (1996). Therefore, "[our] review of a commitment determination is extremely narrow . . . ." Id. at 58. Accordingly, we give the "'utmost deference' [to the trial court's determination] and modif[y] only where the record reveals a clear abuse of discretion." In re J.P., 339 N.J. Super. 443, 459 (App. Div. 2001) (quoting State v. Fields, 77 N.J. 282, 311 (1978)). If the trial

---

[1] J.G. was discharged on October 4, 2023, with no further details appearing in the record. We address the issues based on their constitutional imperatives, despite the discharge.

A-0141-23

court made "supportable findings," we should affirm the decision. <u>In re Civ. Commitment of T.J.</u>, 401 N.J. Super. 111, 119 (App. Div. 2008).

### III.

We review the orders on appeal through this lens, concluding the trial court did not abuse its discretion in entering the September 14 order. We remand to the trial court to set forth specific findings of fact and conclusions of law underpinning its September 28 order granting CEPP.

"Involuntary commitment to a mental hospital is state action which deprives the committee of important liberty interests and, as such, triggers significant due process requirements." <u>In re Civ. Commitment of Raymond S.</u>, 263 N.J. Super. 428, 431 (App. Div. 1993) (citing <u>In re S.L.</u>, 94 N.J. 128, 137 (1983)). "In light of the committee's significant constitutionally protected interests, our Legislature and the New Jersey Supreme Court have promulgated statutes and rules to ensure that no person is involuntarily committed to a psychiatric institution without having been afforded procedural and substantive due process." <u>Ibid.</u> (citing N.J.S.A. 30:4-27.1 to -27.23; <u>R.</u> 4:74-7).

"Consequently, a person may not be involuntarily committed to a psychiatric facility without proof by clear and convincing evidence that the individual has a mental illness, and the mental illness causes the patient to be

A-0141-23

dangerous to self, to others, or to property." Ibid. (citing N.J.S.A. 30:4-27.9(b); N.J.S.A. 30:4-27.15(a); R. 4:74-7(f)). A party seeking to admit a patient to the hospital involuntarily has the burden of establishing a basis for the commitment by clear and convincing evidence. See In re Civ. Commitment of J.R., 390 N.J. Super. 523, 529-30 (App. Div. 2007) ("'The burden should not be placed on the civilly committed patient to justify his right to liberty.'"). "Clear and convincing evidence is evidence that produces 'a firm belief or conviction' that the allegations are true; it is evidence that is 'so clear, direct, and weighty and convincing' that the factfinder can 'come to a clear conviction' of truth without hesitancy." In re Civ. Commitment of R.F., 217 N.J. 152, 173 (2014) (quoting In re Jobes, 108 N.J. 394, 407 (1987)).

Under N.J.S.A. 30:4-27.2(m),

> "[i]n need of involuntary commitment" or "in need of involuntary commitment to treatment" means that an adult with mental illness, whose mental illness causes the person to be dangerous to self or dangerous to others or property and who is unwilling to accept appropriate treatment voluntarily after it has been offered, needs outpatient treatment or inpatient care at a short-term care or psychiatric facility or special psychiatric hospital because other services are not appropriate or available to meet the person's mental health care needs.

Rule 4:74-7(f)(1)[2] is consistent with the statutory authority setting forth

the standard of proof as clear and convincing evidence. The statutory scheme

also defines other relevant terms. Under N.J.S.A. 30:4-27.2(h),

> "[d]angerous to self" means that by reason of mental
> illness the person has threatened or attempted suicide
> or serious bodily harm, or has behaved in such a
> manner as to indicate that the person is unable to
> satisfy his need for nourishment, essential medical
> care or shelter, so that it is probable that substantial
> bodily injury, serious physical harm, or death will
> result within the reasonably foreseeable future;
> however, no person shall be deemed to be unable to
> satisfy his need for nourishment, essential medical

---

[2] Under Rule 4:74-7(f)(1),

> [t]he court shall enter an order authorizing involuntary
> commitment of the patient to an outpatient treatment
> provider or admission to an inpatient setting for
> treatment if it finds, by clear and convincing evidence
> presented at the hearing, that the patient is in need of
> continued involuntary commitment by reason of the
> fact that (1) the patient is mentally ill, (2) mental
> illness causes the patient to be dangerous to self or
> dangerous to others or property as defined in N.J.S.A.
> 30:4-27.2(h) and -.2(i), (3) the patient is unwilling to
> be admitted to a facility for voluntary care or accept
> appropriate treatment voluntarily, and (4) the patient
> needs outpatient treatment as defined by N.J.S.A.
> 30:4-27.2hh or inpatient care at a short-term care or
> psychiatric facility or special psychiatric hospital
> because other less restrictive alternative services are
> not appropriate or available to meet the patient's
> mental health care needs.

A-0141-23

care, or shelter if he is able to satisfy such needs with the supervision and assistance of others who are willing and available. This determination shall take into account a person's history, recent behavior, and any recent act, threat, or serious psychiatric deterioration.

Under N.J.S.A. 30:4-27.2(i),

"[d]angerous to others or property" means that by reason of mental illness there is a substantial likelihood that the person will inflict serious bodily harm upon another person or cause serious property damage within the reasonably foreseeable future. This determination shall take into account a person's history, recent behavior, and any recent act, threat, or serious psychiatric deterioration.

While the court may rely on expert testimony,

[t]he final determination of dangerousness lies with the courts, not the expertise of psychiatrists and psychologists. Courts must balance society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy. The ultimate decision on dangerousness is, therefore, a legal one, not a medical one, even though it is guided by medical expert testimony.

[D.C., 146 N.J. at 59.]

Predicated on our extremely narrow review, we find no abuse of discretion in the trial court's September 14 order of involuntary commitment as substantiated by clear and convincing evidence in the record. Id. at 58-59.

The credible testimony at the September 14 hearing established J.G. was refusing to take her medication, rendering her a danger to herself as she was delusional and paranoid with an inability to function coherently. J.G. was deeply rooted in her ideations that someone was trying to break into her home, necessitating further repeated police intervention posing a danger to others. Though the trial court found the county did not establish J.G. would not provide shelter for herself, the trial court determined J.G. was not functional and her mental illness could not be treated in a less restrictive setting. Based on the clear and convincing credible evidence adduced at the hearing, we affirm.

We are unconvinced that Dr. Sethi's testimony constituted a "net opinion" as it was predicated on his own observations and examinations of J.G. over a nine day period and a review of her medical records as permitted under Rule 703.[3] Hayes v. Delamotte, 231 N.J. 373, 392-93 (2018) (finding "hearsay

---

[3] N.J.R.E. 703 sets forth that

> the facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the proceeding. If of a type reasonably relied upon by experts in the particular field in forming opinions or

statements relied upon by an expert may be used for the limited purpose of apprising the jury of the basis of the testifying expert's opinion"). "Rule 702 permits a qualified expert witness to testify in the form of an opinion or otherwise and Rule 703 addresses the bases of opinion testimony by experts." State v. Townsend, 186 N.J. 473, 494 (2006) (internal quotation marks omitted). Dr. Sethi's testimony did not violate the prohibition against net opinion where "admission into evidence of an expert's conclusions . . . are not supported by factual evidence or other data." Townsend v. Pierre, 221 N.J. 36, 53-54 (2015).

Thus, we affirm the entry of the September 14 order of continued involuntary commitment of J.G. at Buttonwood.

IV.

We remand to the trial court to amplify its findings of fact and conclusions of law underpinning the entry of the CEPP order on September 28, pursuant to Rule 1:7-4.

Our courts have recognized CEPP as appropriate where individuals are unable to care for themselves but do not require treatment in a mental hospital

_____

inferences upon the subject, the facts or data need not be admissible in evidence.

12

if a suitable, alternative, placement can be obtained. S.L., 94 N.J. at 134.

Rule 4:74-7(h)(2) provides:

> Order of [CEPP]. If a patient otherwise entitled to discharge from an inpatient facility cannot be immediately discharged due to the unavailability of an appropriate placement, the court shall enter an order conditionally extending the patient's hospitalization and scheduling a placement review hearing within [sixty] days thereafter . . . .

"If the court determines that the individual is not able to survive in the community independently or with the help of family or friends, the court shall direct that the individual remain in the institution, but immediately schedule a placement review hearing to occur within [sixty] days." S.L., 94 N.J. at 140. Among other safeguards, "all reasonable efforts within available resources shall be made to improve the individual's ability to function in a placement outside the mental hospital." Id. at 141.

At the September 28 hearing, Dr. Sethi testified J.G. was still refusing to take her medication and was continuing to exhibit delusional paranoia. His opinion appeared to be that further commitment was warranted. The trial court found J.G. was not dangerous, despite Dr. Sethi's testimony to the contrary, without specifically rejecting the expert's opinion. However, the trial court also found J.G. could benefit from further hospitalization, while articulating

A-0141-23

the court had a question as to dangerousness. The trial court set forth it was not sure J.G. had a place to go, since the September 14 hearing record established that she previously resided in unspecified supportive housing. The trial court encouraged J.G. to stay at Buttonwood but entered a CEPP order, conditioning her discharge on appropriate placement, without any findings as to whether any supportive housing or discharge alternative existed. J.G. was discharged on October 4, just six days later.

Thus, after reviewing the transcript of the trial court's ruling, we are compelled to remand this matter for the trial court to set forth its factual findings and legal conclusions pursuant to Rule 1:7-4 underpinning the CEPP order, or other amended order it may enter. While the trial court may have been correct in ordering CEPP, absent adequately supported legal conclusions predicated on facts in the record, we are compelled to remand for a statement of reasons. See, e.g. Kas Oriental Rugs, Inc. v. Ellman, 407 N.J. Super. 538, 561 (App. Div. 2009) (finding the appellate court was compelled to "remand for further proceedings because the judge's findings [did] not comport with Rule 1:7-4(a) in a number of respects"). We leave the issue of whether the court should solicit additional submissions from counsel, hear argument, or

14

conduct a plenary hearing under <u>Rule</u> 4:67-5 to the sound discretion of the trial court.

Affirmed in part. Remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0141-23